NOT DESIGNATED FOR PUBLICATION

No. 127,189

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of M.M., a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Submitted without oral argument. Opinion filed October 4, 2024. Affirmed.

*Kaitlin M. Dixon*, of Wichita, for appellant natural mother.

*Amanda M. Marino*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees.

Before ARNOLD-BURGER, C.J., GREEN and COBLE, JJ.

PER CURIAM: In this appeal, Mother argues that the district court erred by terminating her parental rights (TPR) over M.M., a male child who was born in mid-September 2022. Mother argues that this court should reverse the district court's termination of her parental rights over M.M. because it erred by finding her unfit by reason of conduct and conditions that rendered her unable to properly care for M.M. and that her conduct and conditions were unlikely to change in the foreseeable future as provided under K.S.A. 38-2269(a). Alternatively, Mother argues that this court should reverse the district court's finding that termination of her parental rights over M.M. was in M.M.'s best interests as provided under K.S.A. 38-2269(g)(1). Yet, as considered later, there are several grave flaws in Mother's arguments. As a result, we affirm the district court's termination of Mother's parental rights.

1

About a week after M.M. was born, B.P. and S.P., the petitioners, applied for an ex parte order for the district court to find M.M. a child in need of care under K.S.A. 38-2242. In its application, B.P. and S.P. incorporated by reference their petition to find M.M. a child in need of care under K.S.A. 38-2234, which they filed with their ex parte application. In their petition, B.P. and S.P. outlined why they believed placing M.M. in Mother's custody would result in an emergency. In particular, B.P. and S.P feared that Mother intended to sell M.M. or had already sold M.M. to a couple in Texas contrary to K.S.A. 2023 Supp. 59-2121.

In summary, B.P. and S.P. alleged the following: In June 2022, Mother "approached [them] . . . regarding the potential adoption of [M.M.] . . . because she did not have a job, was homeless, and suffered from substance abuse issues." After deciding to adopt M.M., B.P. and S.P. contacted a private adoption agency to help them "navigate an adoption plan with [Mother]." With the help of the adoption agency, B.P. and S.P. assisted Mother with scheduling doctor's appointments and creating a budget for living expenses. They also helped pay for her rent, transportation, and groceries. Paying for such expenses during the adoption process is permissible under K.S.A. 2023 Supp. 59-2121(a)(1)-(a)(6).

Near the end of Mother's pregnancy with M.M., Mother mentioned that she had "approached another couple regarding the potential adoption of [M.M.]," who ultimately decided not to adopt M.M. because she had "use[d] illicit drugs during her pregnancy." Even so, B.P. and S.P. continued to help pay for Mother's pregnancy-related expenses during the remainder of her pregnancy because they "believe[d] that [they] were the only intended adoptive parents of [M.M.]. " But then, once Mother was in labor at the hospital, Mother told them that she wanted to keep custody of M.M. Nevertheless, when hospital staff told Mother that she could not leave the hospital with M.M. because drug testing

established that M.M. was born with methamphetamine in his body, Mother left the hospital against medical advice.

The Kansas Department for Children and Families (DCF) took custody of M.M. immediately after his drug-testing returned positive for methamphetamine. It also placed him in B.P. and S.P.'s temporary custody. Within days of his birth, though, DCF withdrew its pending petition to find M.M. a child in need of care after a couple from Texas filed paperwork to adopt M.M. It seems that several hours after M.M.'s birth, Mother signed a contract with a couple in Texas who decided that they wanted M.M. to be part of their family. In exchange for M.M., the Texas couple paid Mother $19,000 and paid M.M.'s Father's bail, as M.M.'s Father was in jail when M.M. was born. Under K.S.A. 2023 Supp. 59-2121(c) it is a severity level 9 nonperson felony to "[k]nowingly and intentionally receiv[e] or accept[] clearly excessive fees or expenses" in connection with an adoption.

So, in their application for an ex parte order and petition to find M.M. a child in need of care, B.P. and S.P. asserted that Mother illegally sold M.M. to the Texas couple, which itself was an emergency requiring the district court to find M.M. a child in need of care under K.S.A. 38-2202(d)(4). B.P. and S.P. also argued that M.M. was a child in need of care for three other reasons:  (1) because he was without adequate parental care, control, or subsistence as provided under K.S.A. 38-2202(d)(1); (2) because he was without the care or control required to meet his physical, mental, or emotional health needs as provided under K.S.A. 38-2202(d)(2); and (3) because he had been physically, mentally, or emotionally abused or neglected as provided under K.S.A. 38-2202(d)(3).

The district court granted B.P. and S.P.'s application for ex parte order of protective custody the same day that they filed the application. When it granted B.P. and S.P.'s application, it also scheduled a hearing on M.M.'s temporary custody just a few days later. At the temporary custody hearing, Mother did not appear in person. Instead,

3

she appeared through her attorney. In the end, the district court ordered M.M. to remain in DCF custody because of Mother's methamphetamine use, unstable housing, and "pending warrants." Then, it ordered DCF to prepare a permanency plan for Mother and Father, who remained in a romantic relationship. Afterwards, it scheduled Mother's and Father's joint adjudication and disposition hearing for November 18, 2022.

At the November 18, 2022 hearing, Mother appeared in person and through her attorney. When the hearing occurred, Mother was in jail for "a misdemeanor domestic violence" charge. Also, during the hearing, Mother told the district court that she wanted to regain custody of M.M. Rather than having a hearing on whether M.M. was a child in need of care, however, Mother pleaded no contest to M.M. being a child in need of care as alleged in B.P. and S.P.'s petition to find M.M. a child in need of care under K.S.A. 38-2202(d)(1), (d)(2), (d)(3), and (d)(4).

As for Father, he did not appear at the November 18, 2022 adjudication and disposition hearing. B.P. and S.P. explained that they could not locate Father, and thus, had not served Father with notice of the hearing. Because Father had not been served notice of the hearing, B.P. and S.P. asked that the district court continue the adjudication and disposition hearing for Father. When asked by the district court whether they wanted it to wait to consider the disposition of Mother's parental rights until they had served Father notice, B.P. and S.P. told the district court that they were "fine either way." In the end, the district court scheduled a hearing as to the adjudication and disposition of Father and the disposition of Mother's parental rights for January 20, 2023.

At the January 20, 2023 hearing, both Mother and Father appeared through their attorneys but not in person. B.P. and S.P. pointed out that Mother knew about her disposition hearing because she was told about it when she appeared before the district court on November 18, 2022. Regarding Father, B.P. and S.P. explained that they had personally served Father notice of the hearing about a week earlier. When asked by the

4

district court "what would be the factual basis for the adjudication or default," B.P. and S.P. proffered their petition to find M.M. a child in need of care. Without objection, B.P. and S.P. also moved to admit certain exhibits supporting that Mother and Father had not made adequate progress on their reintegration permanency plan.

Specifically, they admitted court reports prepared by Taylor Kern, a permanency specialist with Saint Francis Ministries (Saint Francis), and visitation reports prepared by Kimberly Prentice, a family support worker with Saint Francis. Both Mother and Father had been working with Saint Francis, a private social service agency that DCF contracts with to provide case planning services to help rehabilitate families. Although the district court accepted Mother's no contest plea that M.M. was a child in need of care at the November 18, 2022 hearing, at the January 20, 2023 hearing, the district court relied on B.P. and S.P.'s petition and exhibits to find "that both parents [were] in default and adjudicate[d M.M.] a child in need of care as to both parents." It also approved the permanency plan that Saint Francis created to rehabilitate the family.

On April 6, 2023, the district court held a permanency hearing that Mother did not attend. The district court found that adoption may be in M.M.'s best interests because neither Mother nor Father were "complying with court orders" nor "submitting to drug testing." It then scheduled both Mother's and Father's TPR hearing to occur on May 12, 2023.

Next, on May 2, 2023, B.P. and S.P. moved the district court to terminate both Mother's and Father's parental rights over M.M. In their motion, B.P. and S.P. asserted that the district court should terminate Mother's and Father's parental rights for six reasons: (1) because Parents' use of intoxicating liquors, narcotics, or dangerous drugs prevented them from caring for M.M.'s ongoing physical, mental, or emotional needs as provided under K.S.A. 38-2269(b)(3); (2) because Parents had physically, mentally, or emotionally abused M.M. or neglected M.M. as provided under K.S.A. 38-2269(b)(4);

5

(3) because Parents had failed to reintegrate with M.M. despite Saint Francis' reasonable efforts to rehabilitate the family as provided under K.S.A. 38-2269(b)(7); (4) because Parents failed to adjust their circumstances, conduct, or conditions to meet M.M.'s needs as provided under K.S.A. 38-2269(b)(8); (5) because Parents failed to consistently attend visitations with M.M. or communicate with Saint Francis as provided under K.S.A. 38-2269(c)(2); and (6) because Parents failed to carry out a reasonable reintegration case plan approved by the district court to rehabilitate the family as provided under K.S.A. 38-2269(c)(3). Concerning M.M.'s best interests, B.P. and S.P. asserted that it was in M.M.'s best interests to terminate Parents' rights because M.M. needed permanency. To support this argument, B.P. and S.P. emphasized that M.M. had been in DCF custody his entire life.

Although Father had been personally served notice of his May 12, 2023 TPR hearing, Father did not appear at his TPR hearing. Only Father's attorney was present to represent him. Regardless, B.P. and S.P. admitted several court reports and visitation reports prepared by Kern and Prentice to support the termination of Father's parental rights over M.M. Relying on this evidence, the district court granted B.P. and S.P.'s petition to terminate Father's parental rights. As for Mother, the district court continued her TPR hearing until June 14, 2023.

The transcript from the May 12, 2023 TPR hearing is not in the record on appeal. Nevertheless, a court report that Kern made after the May 12, 2023 TPR hearing explains why the district court continued Mother's TPR hearing. Kern's court report said that when Mother appeared at the TPR hearing, Mother told the district court that she was pregnant and "showing signs of miscarriage." Evidently, because Mother had an outstanding warrant, law enforcement arrested Mother at her May 12, 2023 TPR hearing. While she was in custody, though, the district court ordered Mother to complete a drug test. Although when asked by the district court during the hearing Mother denied using methamphetamine, Mother's drug test was positive for methamphetamine.

6

At Mother's continued TPR hearing on June 14, 2023, Mother appeared through her attorney but not in person. B.P. and S.P.'s attorney explained to the district court that Mother knew about the hearing because "she had a visit yesterday afternoon and was reminded of this court hearing." The attorney also explained "[t]he workers" tried calling Mother's "phone [that] morning and it just automatically hung up." Although Mother did not appear, Mother's attorney explained that Mother's "last instruction . . . was that she wanted a trial." So, the district court held Mother's TPR hearing in absentia. Kern was the only person who testified at Mother's TPR hearing.

Before Kern testified on B.P. and S.P.'s behalf, however, B.P. and S.P.'s attorney asked the district court to take judicial notice of two cases. The two cases that the attorney asked the district court judge to take judicial notice of were cases that the same judge had presided over. In those cases, the judge had terminated Mother's parental rights over her child born in 2014 and her child born in 2020. When B.P. and S.P.'s attorney asked the judge to take judicial notice of those cases and to admit the TPR orders from the cases into evidence, Mother's attorney said that he had "[n]o objection." Likewise, when B.P. and S.P. successfully moved to admit 14 exhibits into evidence, Mother's attorney had no objection. The majority of the 14 exhibits B.P. and S.P. admitted into evidence were court reports written by Kern or visitation reports written by Prentice.

Prentice's visitation reports show that Mother was never allowed to have visitations with M.M. alone or outside Saint Francis' office. Each of Mother's weekly visitations with M.M. were one-hour supervised visits inside Saint Francis' office. In the court report that Kern prepared for Mother's June 14, 2023, TPR hearing, Kern discussed how M.M. entered DCF custody after drug testing at his birth showed he had methamphetamine in his body. She discussed how B.P. and S.P. petitioned the district court to find M.M. a child in need of care because Mother had tried to sell M.M. to a couple from Texas for $19,000. She discussed how M.M. was "suspected of being delayed developmentally by his primary care physician." She discussed that M.M. had a

"slight 'lazy eye' . . . and there [were] concerns that he [was] not tracking how he should be." She explained that M.M. was in physical therapy because of "the shape of his head" and that he may have to wear a helmet. She also explained that M.M. was bonded to his foster parents, B.P. and S.P., whom he had lived with his entire life; M.M. was about nine months old as of Mother's June 14, 2023 TPR hearing.

As for Mother's progress toward reintegrating with M.M., in the same court report, Kern explained why she believed that the district court should terminate Mother's parental rights over M.M. Kern's report asserted Mother made inadequate progress completing her reintegration case plan tasks. She explained that from Mother's first case planning conference on September 30, 2022, to Mother's June 14, 2023 TPR hearing, Mother had not completed any of her mandatory reintegration case plan tasks, which were as follows: (1) to sign all releases requested that were necessary to complete her reintegration case plan tasks; (2) to follow all recommendations of any assessment, evaluation, test, or treatment programs she completed; (3) to obtain, maintain, and provide proof of employment to Saint Francis; (4) to obtain, maintain, and provide proof of stable housing to Saint Francis; (5) to abstain from drinking alcohol or using illegal drugs; (6) to complete random urinalysis drug testing when requested; (7) to complete hair-follicle drug testing every 90 days; (8) to complete and follow all recommendations of a substance abuse evaluation; (9) to complete a parenting course and provide proof of completion to Saint Francis; (10) to implement skills learned at the parenting course during visitations with M.M.; (11) to complete a budget and nutrition course and provide proof of completion to Saint Francis; and (12) to complete and follow all recommendations of a clinical assessment, "including individual therapy and/or medication management."

Regarding drug testing specifically, Kern reported that Mother failed to complete drug testing each time she was requested to do so. According to Kern's report for Mother's June 14, 2023 TPR hearing, she had asked Mother to complete drug testing 18

8

times. In addition, in this court report, Kern discussed Mother's inconsistent behavior, Mother's erratic behavior, and Mother's abusive relationship with Father. As of Kern's final amendments to this court report, Kern explained that Mother had told either her, B.P., or S.P. that she did not want to reintegrate with M.M. four times. Mother waivered back-and-forth between wanting to reintegrate with M.M. and saying that M.M. would be safer with B.P. and S.P. She reported that the final time Mother said that she no longer wanted to reintegrate with M.M. was March 14, 2023. She explained that as M.M.'s CINC case was pending, Mother had not attended scheduled visitations, cancelled scheduled visitations, or showed up late for scheduled visitations with M.M. 11 times. She reported that the last scheduled visit that Mother cancelled was on May 30, 2023. On that date, Mother's grandmother called her, explaining that Mother would not attend the scheduled visitation with M.M. because she was in the hospital emergency room with a toothache that had caused her to "pass out." Of note, while M.M.'s CINC case was pending, Kern also reported that Mother had told her that Father "dragged her" to Colorado after stealing her car, that she intended to move to Texas, and that she intended to move from Wichita, Kansas—where she currently lived—to Topeka, Kansas.

Kern reported that Mother sometimes texted S.P. and B.P. "at strange hours of the night." Mother showed up at S.P. and B.P.'s home unexpectedly, including once in early January 2023 when she knew that M.M. was being quarantined because he had COVID-19. After learning M.M. had been diagnosed with COVID-19, Mother also sent angry text messages to Prentice. In the text messages, which Prentice never responded to, Mother told Prentice that her "son has COVID u price [*sic*] of shit I fucking hate u bitch." She then texted the following: "I'll go back to jail fuck u fuxk [W.J.]. I need to fucking leave now bring me that god damn car now." In her next text messages to Prentice, though, Mother apologized for sending the earlier text messages while explaining that she thought she was texting Father about stealing her car.

As for the state of Mother's relationship with Father, Kern discussed instances when Mother told her that Father was physically abusing her. Mother once told Kern that she wanted a protection from abuse order against Father. Several days later, however, Mother told Kern that she no longer wanted the protection from abuse order. Kern reported that on March 21, 2023, Mother alleged that she missed a scheduled visitation with M.M. because Father had stolen her purse. At this same time, Mother told Kern that she did not want Father to be alone with M.M. because he had "been assaulting her and it [had] been worse since he found out that she [was] pregnant." Nevertheless, shortly after telling Kern this, Mother changed her mind. Kern reported that Mother said that Father "should be able to visit his son alone." Still, during Mother's April 4, 2023 visitation with M.M., Mother told Kern that her left eye was bruised because Father had headbutted her.

During her actual testimony on B.P. and S.P.'s behalf, Kern testified about some of the information in her final court report; this included testifying that Mother had not completed any of her other reintegration case plan tasks. Kern explained that although Mother had completed a substance abuse evaluation, Mother had not followed the recommendation of her evaluation, which was to enter intensive inpatient substance abuse treatment. She explained that the only drug test Mother completed during the duration of M.M.'s CINC case was the drug test that the district court ordered her to complete when she appeared at her originally scheduled TPR hearing on May 12, 2023. Kern explained that at that time, Mother's drug test was positive for methamphetamine use, and Mother was pregnant. She testified that to her knowledge, Mother was still pregnant. She also testified that she was worried about returning M.M. to Mother's custody because as of the day before—June 13, 2023—Mother told her that she was still in a relationship with Father.

Based on information Mother previously provided Kern, Mother would have been about four months pregnant when her drug test was positive for methamphetamine use.

Based on this same information, as of Mother's June 14, 2023 TPR hearing, Mother would have been almost six months pregnant.

Next, when asked by B.P. and S.P.'s attorney whether she believed that she and other Saint Francis' workers had "taken time to assist [Mother]" with completing and following her reintegration case plan tasks, Kern testified that Saint Francis' staff had taken time to assist Mother. She explained that Mother's contact with Saint Francis and visitation attendance was inconsistent. When B.P. and S.P.'s attorney directly asked Kern whether Saint Francis had given Mother a bus pass, Kern testified that Mother had been given a bus pass so she had reliable transportation. When B.P. and S.P.'s attorney asked Kern whether she believed that Mother could ever successfully reintegrate with M.M., Kern responded that she did not believe so. She explained that Mother's overall failure to complete and comply with any of her reintegration case plan tasks, Mother's ongoing substance abuse, and Mother's suspected mental health issues were concerning. She testified that in her opinion, Mother had not made any strides or improvements during the duration of M.M.'s CINC case. While stressing that M.M. had been in DCF custody since his birth in mid-September 2022, Kern also testified that she believed that it was in M.M.'s best interests to terminate Mother's parental rights.

Mother's attorney did not cross-examine Kern. In addition, Mother's attorney did not present any evidence, did not make any closing arguments, and did not object when the district court asked the parties whether they wanted "a ruling at this time." Rather, Mother's attorney responded to B.P. and S.P.'s request for the district court to immediately enter its ruling by saying, "I don't have any counterarguments." So, after Kern's testimony, the district court ruled on B.P. and S.P.'s TPR motion.

From the bench, the district court explained that it was granting B.P. and S.P.'s TPR motion for the following reasons:

11

"Based upon the testimony of [Kern], the Court will adopt . . . the Petitioner's proposed requested findings as findings of the Court. And the Court will adopt the Petitioner's requested orders as orders of the Court. Specifically, the Court has . . . considered child time. This case has been open since . . . September of 2022. The Court will also make a finding that a primary consideration in terminating parental rights is the physical, mental, and emotional health of the child. The Court will also make a finding that it is in the best interest of the child that parental rights be terminated."

In its order terminating Mother's parental rights, the district court repeated that it had "adopt[ed] the allegations and requested findings as set forth" by B.P. and S.P. It explicitly stated that there was clear and convincing evidence to terminate Mother's parental rights because Mother was unfit by reason of conduct and conditions that rendered her unable to properly care for M.M. and that her conduct and conditions were unlikely to change in the foreseeable future as provided under K.S.A. 38-2269(a). As B.P. and S.P. requested, the district court relied on subsections (b)(3), (b)(4), (b)(7), (b)(8), (c)(2), and (c)(3) of K.S.A. 38-2269 to support its parental unfitness finding.

Although Mother's motion is not in the record on appeal, after her TPR hearing, Mother moved the district court to reconsider its TPR order. But at her motion hearing, Mother failed to appear. Because Mother failed to appear at her own motion hearing, the district court found that there was no good cause to reverse its termination ruling.

Mother timely appeals the termination of her parental rights over M.M.

ANALYSIS

I. *Did the district court err by terminating Mother's parental rights over M.M.?*

Under K.S.A. 38-2269(a), after the district court adjudicates a child as being in need of care, the district court may terminate a parent's rights over that child "when the

court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." When deciding whether a parent is unfit as provided under K.S.A. 38-2269(a), the district court should consider subsection (b)'s nonexclusive list of factors that may establish a parent's unfitness. When the child is not in the parent's physical custody, the district court should also consider factors that may prove a parent's unfitness under K.S.A. 38-2269(c). Finally, if the district court finds a parent unfit as provided under K.S.A. 38-2269(a), the district court must "consider whether termination of parental rights as requested in the petition is in the best interests of the child" under subsection (g)(1). In making its best interests of the child finding, the district court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1).

As just explained, the district court found that Mother was unfit by reason of conduct and conditions that rendered her unable to properly care for M.M. and that her conduct and conditions were unlikely to change in the foreseeable future as provided under K.S.A. 38-2269(a) by relying on subsection (b)'s and (c)'s nonexclusive factors that may support termination of a parent's rights of a child. The subsections that the district court relied on state:

> "(b) In making a determination of unfitness, the court should consider, but is not limited to, the following, if applicable:
> . . . .
> (3) the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;
> (4) physical, mental or emotional abuse or neglect or sexual abuse of a child;
> . . . .
> (7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

13

(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

. . . .

"(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

On appeal, this court reviews the district court's parental unfitness finding under K.S.A. 38-2269(a) for clear and convincing evidence. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020); see also *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (holding that the clear and convincing evidence standard of review, not the substantial competent evidence standard of review, applies when deciding whether a child is a child in need of care). Under the clear and convincing evidence standard of review, this court must consider whether after reviewing all the evidence in the light most favorable to the petitioner, the district court's fact-findings are deemed highly probable. Significantly, while engaging in this review, this court may not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G*, 311 Kan. at 806. As for a district court's finding that termination of a parent's rights over a child is in the child's best interests under K.S.A. 38-2269(g)(1), this court reviews the district court's decision for an abuse of discretion. *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021). A district court abuses its discretion if it makes an error of law, an error of fact, or some unreasonable decision. 61 Kan App. 2d at 330.

Before addressing the parties' arguments, though, it is important for this court to note that both parties rely on the wrong standards of review on appeal when analyzing the district court's parental unfitness findings under K.S.A. 38-2269(a). Indeed, the parties

appear to not understand the difference between the burden of proving substantial competent evidence and clear and convincing evidence. Throughout their briefs, the parties conflate these two standards, discussing the standards interchangeably. They rely on outdated caselaw. And they do so without ever recognizing that our Supreme Court explicitly held in *In re B.D.-Y.*, about 16 years ago, that the clear and convincing evidence standard of review, not the substantial competent evidence standard of review, applies when reviewing the district court's parental unfitness findings under K.S.A. 38-2269(a). 286 Kan. at 700-05 (discussing the modification of the standard of review).

Notwithstanding the parties' reliance on a standard of review that our Supreme Court reversed nearly 16 years ago, on appeal, Mother challenges each of the district court's parental unfitness findings as well as its finding that termination of her parental rights over M.M. was in M.M.'s best interests. In arguing that the district court erred by finding her unfit to parent M.M. under K.S.A. 38-2269(b)(3), (b)(4), (b)(7), (b)(8), (c)(2), and (c)(3), Mother frequently asserts that there was insufficient evidence to support the district court's unfitness finding based solely on Kern's testimony. She argues that this court cannot rely on the exhibits admitted at her June 14, 2023 TPR hearing because there is no evidence that the district court considered the exhibits before terminating her parental rights over M.M. In the alternative, she argues that if the district court considered the exhibits that B.P. and S.P. admitted into evidence at her June 14, 2023 TPR hearing, the district court "would have read about Mother's loving interactions with [M.M.] during her visits as documented in the visitation summaries" prepared by Prentice. When challenging the district court's finding that it was in M.M.'s best interests to terminate Mother's parental rights as stated under K.S.A. 38-2269(g)(1), Mother repeats her arguments about the district court never reviewing the exhibits admitted by B.P. and S.P. during her TPR hearing and that if it had reviewed those exhibits, it would not have terminated her parental rights. Throughout her brief, Mother also repeatedly asserts that Saint Francis did not make reasonable efforts to reintegrate M.M. with her.

In response, B.P. and S.P. argue that Mother cites no caselaw supporting her assertion that this court cannot rely on the exhibits that they admitted at Mother's TPR hearing. B.P. and S.P. also assert that even if this court does not consider the exhibits they admitted at Mother's June 14, 2023 TPR hearing, Kern's testimony about Mother's drug use affecting her ability to properly care for M.M. and Mother's failure to complete any of her reintegration case plan tasks proved her parental unfitness under K.S.A. 38-2269(a). They argue that Mother's complaints about Saint Francis not making reasonable efforts to reintegrate M.M. with her hinges on ignoring unfavorable evidence. This includes Mother ignoring her own behavior that resulted in her missing numerous visitations, missing mandatory drug tests, and missing court hearings. They assert that Mother's general instability supports the district court's decision that Mother was unable to properly care for M.M. and unlikely to become fit to care for M.M. in the foreseeable future. Relying on this same evidence, B.P. and S.P. contend that the district court correctly found that termination of Mother's parental rights was in M.M.'s best interests under K.S.A. 38-2269(g)(1).

Although Mother's argument about the district court not considering the exhibits that B.P. and S.P. admitted into evidence at her June 14, 2023 TPR hearing before terminating her parental rights is persuasive, Mother's remaining arguments require this court to reweigh the district court's fact-findings contrary to this court's standard of review. See *In re Adoption of Baby Girl G.*, 311 Kan. at 806. In short, each of Mother's arguments would require this court to abruptly discard the evidence supporting the district court's parental unfitness finding while cherry-picking evidence that allegedly supports her parental fitness.

Yet, to begin with, Mother correctly argues that nothing in the transcript of Mother's June 14, 2023 TPR hearing suggests that the district court reviewed the exhibits admitted by B.P. and S.P. before terminating her parental rights. Although *In re K.H.*, 56 Kan. App. 2d 1135, 1141, 444 P.3d 354 (2019), involved whether a district court properly

16

took judicial notice of files in a CINC case before relying on the files to terminate a parent's rights, the case is instructive on the district court's apparent failure to review most of the exhibits admitted into evidence. In that case, this court explained that in CINC cases, there are two files—"the official file containing all the pleadings filed in district court and the social file containing reports and evaluations of the parties involved in the case." 56 Kan. App. 2d at 1141. While addressing the differences between the district court's official file and the social file, this court explained that the district court may take judicial notice of its own official files. 56 Kan. App. 2d at 1141; see K.S.A. 60-409(a). But this court also explained that the district court should review whatever documents it takes judicial notice of before relying on those documents to terminate a parent's rights over his or her child. 56 Kan. App. 2d at 1141.

Here, nothing within the transcript of Mother's June 14, 2023 TPR hearing indicates that the district court reviewed the 14 exhibits B.P. and S.P. admitted into evidence, which were primarily documents from the social file of M.M.'s CINC case. Still, Mother's argument about the district court not reviewing the exhibits from the social file admitted into evidence before terminating her parental rights ignores that when B.P. and S.P. admitted the court reports prepared by Kern and the visitations reports prepared by Prentice, Mother never objected. Then, at the end of evidence, counsel for Mother told the district court that it had no "counterarguments" to the district court ruling on B.P. and S.P.'s TPR motion from the bench.

In her brief, Mother never acknowledges that her attorney (1) never objected to the admission of the court reports and visitations reports and (2) never objected to the district court ruling from the bench without first reviewing the exhibits admitted by B.P. and S.P. Because Mother did not object to the district court's admission of the court reports and visitations reports, it follows that Mother cannot challenge the admission of the disputed exhibits on appeal. See K.S.A. 60-404 (absent a timely and specific objection, an appellate court cannot review arguments regarding the admission of evidence on appeal).

17

Additionally, because Mother did not object to the admission of the disputed exhibits, Mother is challenging the district court's reliance on Kern's court reports and Prentice's visitation reports for the first time on appeal. It is a well-known rule that parties cannot raise an argument for the first time on appeal absent an exception to this general rule. *In re Adoption of Baby Girl G.*, 311 Kan. at 801. In her brief, Mother never acknowledges that she is raising this argument for the first time on appeal. Thus, in her brief, Mother never argues that an exception allows this court to consider this argument for the first time on appeal. Our Supreme Court has held that Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36), which requires a party to explain why an argument is being raised for the first time on appeal, should be strictly enforced. For this reason, our Supreme Court has held that parties who fail to comply with Rule 6.02(a)(5) risk having their argument deemed inadequately briefed, which is akin to waiving or abandoning their argument. *In re N.E.*, 316 Kan. 391, 408, 516 P.3d 586 (2022). So, by violating Rule 6.02(a)(5)'s requirement to explain why she is challenging the district court's apparent failure to review B.P. and S.P.'s exhibits for the first time on appeal, Mother has waived and abandoned this argument.

Mother's arguments also ignore several other details of her TPR hearing that undermine her contentions about the inadequacy of the district court's parental unfitness finding under K.S.A. 38-2269(a). First, Mother is unwilling to acknowledge that on May 12, 2023—the day Mother was originally scheduled to have her TPR hearing—B.P. and S.P. successfully moved to admit court reports prepared by Kern and visitation reports prepared by Prentice to support their motion to terminate Father's parental rights. One exhibit that B.P. and S.P. successfully admitted was Kern's court report for the May 12, 2023 TPR hearing, which addressed much of the same information that Kern included in her court report for her rescheduled June 14, 2023 TPR hearing. In the court report for the May 12, 2023 hearing, Kern addressed the following: (1) that B.P. and S.P. had petitioned the district court to find M.M. a child in need of care after Mother tried selling M.M. to a couple from Texas; (2) that M.M. entered DCF custody after he drug-tested

18

positive for methamphetamine at birth; (3) that M.M.'s primary care doctor believed that he may be developmentally delayed; (4) that Mother had not completed any of her reintegration case plan tasks; (5) that Mother had arrived at B.P. and S.P.'s house unexpectedly when M.M. had COVID-19; (6) that Mother had sent inappropriate text messages to Prentice after learning that M.M. had COVID-19; (7) that Mother had told her that she was moving away from Wichita multiple times; (8) that Father physically abused her, stole her car, stole her purse, and dragged her to Colorado; and (9) that Mother had not taken any of the 17 drug tests that she asked her to take. Thus, even if the district court did not review the exhibits admitted at Mother's June 14, 2023 TPR hearing, the district court may have reviewed many of the exhibits that B.P. and S.P. admitted to support the termination of Father's parental rights of M.M. at her originally scheduled TPR hearing on May 12, 2023.

Second, a child must be adjudicated as a child in need of care before the district court may terminate a parent's rights over the child. K.S.A. 38-2269(a). Here, Mother's arguments ignore that she pleaded no contest to M.M. being a child in need of care as alleged in B.P. and S.P.'s petition. Also, although the district court accepted Mother's no contest plea at the November 18, 2022 hearing, the district court also adjudicated M.M. a child in need of care as to Mother, finding her in default, when she failed to appear at the January 20, 2023 hearing. This means that regardless of whether the district court reviewed Kern's court reports admitted into evidence at Mother's June 14, 2023 TPR hearing, Mother never contested the district court's CINC finding about trying to sell M.M. to a couple from Texas in exchange for $19,000 and the cost of bailing out Father from jail after having previously entered into an adoption agreement with B.P. and S.P. Simply put, Mother's contention that she was fit to parent M.M. is demolished by Mother's attempt to sell M.M. just hours after his birth.

As previously noted, K.S.A. 2023 Supp. 59-2121(a) and (c) provide that "[k]nowingly and intentionally receiving or accepting clearly excessive fees or expenses"

19

"in connection with an adoption" is a severity level 9 nonperson felony. Our Supreme Court has previously explained that "the purpose of K.S.A. 59-2121 is to discourage the marketing of children by limiting the profitability of such activity." *State v. Brown*, 272 Kan. 843, 852, 35 P.3d 910 (2001). Mother's attempt to sell M.M. is incredibly troubling. Mother entered into an adoption agreement with B.P. and S.P. Under this agreement, B.P. and S.P. paid for many of Mother's expenses during her pregnancy with M.M. in accordance with K.S.A. 59-2121(a). Then, Mother attempted to sell M.M. to a couple in Texas for $19,000 several hours after M.M.'s birth. Although B.P. and S.P. carried the burden of proving that Mother's parental rights over M.M. should be terminated before the district court, all of Mother's arguments ignore that she presented no evidence contradicting Kern's testimony. Thus, the evidence before the district court that Mother tried selling M.M. was entirely uncontested.

Third, Mother's arguments ignore that the district court judge, who presided over this case, also presided over Mother's TPR hearings in two previous cases. In this case, the district court judge took judicial notice of two earlier cases that he had presided over upon B.P. and S.P.'s request and without objection by Mother. Likewise, upon B.P. and S.P.'s request, the judge admitted the TPR orders he had entered in those two earlier cases into evidence and without objection by Mother. It is readily apparent from the hearing where Mother pleaded no-contest to M.M. being a child in need of care as stated in B.P. and S.P.'s petition that the district court judge remembered Mother. He asked Mother how many children she had now. Mother told the judge that M.M. was her fourth child. Then, the judge asked Mother, "Are you ever going to be able to work through things and work things out to where you don't have to go through all this stuff?" Mother responded, "I hope this is my last thing."

Then, when B.P. and S.P. asked the district court judge to take judicial notice of the termination of Mother's parental rights over two of her older children, the judge was already familiar with the cases he was taking judicial notice of. In those two cases, he had

20

terminated Mother's parental rights over her child born in 2014 and her child born in 2020. So, even if the TPR hearing transcript does not indicate that the district court judge reviewed the previous TPR orders, the judge entered, and thus, knew why he had terminated Mother's parental rights over those children. Also, as with the other exhibits admitted into evidence, because Mother did not object to the admission of the judge's earlier TPR orders, Mother cannot challenge the admission of those TPR orders on appeal. See K.S.A. 60-404.

Fourth, a quick review of those TPR orders proves that Mother has struggled with substance abuse problems and failing to appear at important court hearings for several years. When the district court judge terminated Mother's parental rights over her child born in 2014, the judge found that Mother's dangerous drug use rendered her unable to care for her child's ongoing physical, mental, or emotional needs as provided under K.S.A. 38-2269(b)(3). This order also indicates that as of the termination of her parental rights of this child, she had previously been charged by the City of Wichita for six crimes involving domestic violence. The TPR order for Mother's child born in 2020 explains that when the district court held Mother's TPR hearing in late-June 2021, Mother failed to appear. When the district court judge terminated her parental rights in the earlier CINC cases, the judge also relied on K.S.A. 38-2269 subsections (b)(7), (b)(8), and (c)(3). This means that in both cases, the judge found that Mother was unable to properly care for the two older children and was unlikely to be able to care for the two older children in the foreseeable future for the following reasons: (1) because Saint Francis' reasonable efforts to reintegrate the children with Mother failed as provided under subsection (b)(7); (2) because Mother failed to adjust her circumstances, conduct, or conditions to meet her children's needs as provided under subsection (b)(8); and (3) because Mother failed to carry out a reasonable court-approved case plan to help reintegrate the children with Mother as provided under subsection (c)(3).

21

Fifth, Mother's arguments ignore that she repeatedly failed to appear at her court hearings, including her continued TPR hearing on June 14, 2023. At that hearing, B.P. and S.P.'s attorney told the district court that Mother had "notice by this Court" of the hearing and "was reminded of [the] hearing" the day before. She explained that Saint Francis' staff had also tried calling Mother that morning. In addition, the district court's termination order stated that "Mother was personally served with a copy of the Motion for [the] termination hearing and was given notice in person."

Undoubtedly, Mother's failure to attend her own TPR hearing despite knowing that her TPR hearing was occurring that day is strong evidence that Mother had not adjusted her conduct or condition to properly care for M.M. and was unlikely to adjust her conduct or condition to properly care for M.M. in the foreseeable future. Although Mother contends that the only evidence the district court relied on at her TPR hearing was Kern's testimony, the district court could consider Mother's failure to attend her TPR hearing as evidence that Mother was currently unfit to care for M.M. and unlikely to become fit to care for M.M. in the foreseeable future. Mother's failure to appear at her own TPR hearing was an irrefutable fact before the district court. Additionally, Mother cites no authority why the district court could not rely on her failure to attend her TPR hearing as evidence of her unfitness. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (a party fails to adequately brief, and thus abandons, any argument that the party fails to support with pertinent authority).

Sixth, Mother's arguments ignore the scope of Kern's testimony. At Mother's TPR hearing, Kern testified about submitting her court reports to the district court throughout M.M.'s CINC case. Kern testified that although Mother completed her substance abuse evaluation, she did not follow the evaluation's recommendation to attend intensive inpatient treatment. Kern testified that Mother never completed a urinalysis test or hair follicle test when she asked, but Mother had completed a drug test when ordered by the court when she appeared at her originally scheduled TPR hearing on May 12, 2023. She

22

explained that Mother's drug test showed she had been using methamphetamine. Kern testified that Mother was pregnant again. Although Kern did not explicitly testify that Mother was pregnant when she took the court-ordered drug test, it is undisputed that Mother was pregnant at the May 12, 2023 hearing as Mother told the district court at that hearing that she thought she was in the process of having a miscarriage. Kern further testified that drug testing at M.M.'s birth proved that M.M. was born with methamphetamine in his body.

Also, Kern discussed how Mother had inconsistent contact with Saint Francis, had inconsistent visitation attendance, had inconsistent housing, and had an ongoing physically abusive relationship with Father. Concerning Mother's contact with Saint Francis staff, Kern explained that Saint Francis staff had difficulty reaching Mother because she kept using different phone numbers to communicate with them. Similarly, Kern explained that Mother was "very inconsistent with visits." Concerning Mother and Father's relationship, she testified that when Mother had noticeable bruising on her, she told her that Father had headbutted her. Kern testified that Mother had made no strides towards reintegrating with M.M. although she and other Saint Francis staff had tried to help her. She explained that Mother only attended one permanency plan hearing, which she attended by phone. Kern explicitly testified that she did not think Mother would ever become fit to properly care for M.M. and that termination of Mother's parental rights over M.M. was in M.M.'s best interests. In doing so, Kern stressed Mother had not completed any of her reintegration case plan tasks, Mother had ongoing substance abuse problems, and Mother appeared to have mental health issues.

So, even if this court relied solely on Mother's failure to appear and Kern's testimony at her continued TPR hearing on June 14, 2023, when analyzing whether the district court erred, the evidence supported that Mother had an unstable lifestyle and engaged in inconsistent behavior. The evidence supported that Mother knew about her TPR hearing but chose not to attend it. The evidence proved Mother had not completed

any of her reintegration case plan tasks. It proved that Mother continued to have serious substance abuse issues throughout M.M.'s CINC case. It proved that although Mother was pregnant again, Mother had used methamphetamine during her pregnancy. In other words, the evidence established that Mother was engaging in the same conduct that resulted in DCF immediately taking custody of M.M. at M.M.'s birth.

Mother's remaining arguments why the district court wrongly ruled her unfit under K.S.A. 38-2269 are a snare and delusion. Mother contends that the only evidence about her drug use was Kern's testimony that Mother had not completed any drug tests when she requested. As just outlined, though, Kern testified that drug testing proved that M.M. was born with methamphetamine in his body. She testified the only drug test that Mother completed during M.M.'s CINC case was the court-ordered test that was positive for methamphetamine. Once more, at Mother's original scheduled TPR hearing on May 12, 2023, the district court learned that Mother was pregnant because she told the district court that she thought that she was having a miscarriage. Despite telling the district court that she thought she was having a miscarriage at that hearing, at her continued TPR hearing on June 14, 2023, Kern testified that Mother was still pregnant.

Thus, the evidence before the district court at Mother's June 14, 2023 TPR hearing was that the only drug test Mother ever completed during the duration of M.M.'s CINC case showed that Mother was using methamphetamine while pregnant. Because Mother's sole drug test showed that she was still using methamphetamine, Mother's failure to complete any other drug test Kern requested her to take strongly implies that Mother used methamphetamine throughout the duration of M.M.'s CINC case.

Mother's suggestion that Mother's current methamphetamine use did not cause harm to M.M. is disingenuous. It ignores that Kern testified that M.M. was born with methamphetamine in his body. A district court may take judicial notice without a party's request of "specific facts and propositions of generalized knowledge which are capable of

24

immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." K.S.A. 60-409(b). The fact that children who were exposed to methamphetamine during pregnancy are more likely to have birth defects or special needs is within generalized knowledge that a court may take judicial notice of. See Flannery, et al., *The Use of Hair Analysis to Test Children for Exposure to Methamphetamine*, 10 Michigan State University Journal of Medicine and Law, 143, 169 (2006) (explaining that prenatal exposure to methamphetamine often results in a child being born with "smaller brain structures in the regions of the brain affected by methamphetamine, and scor[ing] lower on measures of visual motor integration, attention, verbal memory, and long-term spatial memory"). M.M.'s doctor believed that he is developmentally delayed. DCF took custody of M.M. upon his birth because Mother's methamphetamine use during her pregnancy resulted in M.M. being born with methamphetamine in his body. Thus, Mother cannot persuasively argue that her methamphetamine use has not harmed M.M.

Regarding Mother's arguments about Saint Francis making inadequate efforts to reintegrate M.M. with her, all of Mother's arguments hinge on reweighing the evidence in her favor. Throughout her brief, Mother suggests that Kern and other Saint Francis' staff did nothing to help her successfully reintegrate with M.M. other than giving her a resource guide and a bus pass. She argues that Saint Francis' staff should have given her access to "specialized substance abuse treatment programs," "housing assistance initiatives," and "support services tailored to survivors of domestic violence."

But Kern testified about Mother's inconsistent contact with Saint Francis' staff. She explained that Mother only attended one permanency case planning conference. She explained that Saint Francis' staff had difficulties communicating with Mother because she did not have a consistent phone number or consistent housing. Mother relied on family and friends for housing. Similarly, she explained that Mother frequently missed her visitations with M.M.

25

In short, Mother has no basis for complaining about receiving inadequate help from Saint Francis' staff to reintegrate with M.M. when she failed to maintain consistent contact with the staff trying to help Mother reintegrate with M.M. In addition, although Mother complains about Saint Francis' staff's efforts to help her get specialized treatment for her substance abuse problems, Kern testified that Mother's substance abuse evaluation recommended she enter inpatient drug treatment. But Mother never did. As for Mother's argument that Saint Francis should have given her specialized access to courses for survivors of domestic violence, Mother's argument ignores that she was still involved in a physically abusive relationship with Father. There is only so much an agency can do to help a parent overcome the trauma of domestic violence if that parent remains in the physically abusive relationship.

Under K.S.A. 38-2269(b)(7), the district court may find a parent unfit when the private agency's "*reasonable efforts*" failed to rehabilitate the family. (Emphasis added.) This court has previously explained that the "'purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, *but to do so the parent must exert some effort.*'" (Emphasis added.) *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). As a result, as B.P. and S.P. assert in their brief, Saint Francis' staff did not have to make herculean efforts to reintegrate M.M. with Mother. Here, based on the evidence before the district court at Mother's June 14, 2023 TPR hearing, Saint Francis' staff made reasonable efforts to reintegrate M.M. with Mother.

Mother's last argument challenging the district court's parental unfitness findings is that under the assumption the exhibits from the social file of M.M.'s CINC case were properly admitted, those exhibits support Mother acted appropriately at her weekly one-hour supervised visits. In making this argument, Mother ignores that she frequently missed her scheduled visits with M.M. Additionally, she ignores that there is ample evidence proving that Mother sometimes acted inappropriately at her visitations with M.M. During Mother's visitations with M.M. between March 28, 2023, and May 23,

26

2023, Prentice reported that Mother came to the visits with Father twice despite being previously told that they must have separate visits. During one visit, Mother took M.M. to a store despite Prentice's direction not to do so. During another visit, Mother tried feeding M.M. baby food from a baby bottle despite Prentice's direction to wait for her to get a spoon to safely feed M.M. In fact, Mother chose to disregard Prentice's direction to wait to feed M.M. baby food with a spoon until Prentice left the visitation room to retrieve a spoon for Mother to safely feed M.M. Thus, although Prentice had told Mother she was going to get a spoon, Mother used her time alone with M.M. to try to feed him baby food with the bottle.

To summarize, even if this court relied solely on Kern's testimony and Mother's failure to appear at her June 14, 2023 TPR hearing, in the light most favorable to B.P. and S.P., clear and convincing evidence supported the district court's findings that Mother was unfit by reason of conduct and conditions that rendered her unable to properly care for M.M. and that her conduct and conditions were unlikely to change in the foreseeable future as required under K.S.A. 38-2269(a). Essentially, Mother's arguments against terminating her parental rights boils down to her seeking to be excused from changing her conduct, conditions, or circumstances to ensure M.M.'s health and safety. Indeed, the evidence before the district court proved that Mother's ongoing methamphetamine use rendered her unable to care for M.M.'s ongoing physical, mental, and emotional needs as stated under K.S.A. 38-2269(b)(3). It proved that Mother's drug use resulted in M.M. suffering physical, mental, emotional abuse, or neglect as stated under K.S.A. 38-2269(b)(4). It supported that should Mother be reintegrated with M.M., Mother's ongoing drug use would result in M.M. suffering physical, mental, emotional abuse, or neglect as stated under K.S.A. 38-2269(b)(4). It proved that Saint Francis' reasonable efforts to rehabilitate Mother with M.M. had failed as provided under K.S.A. 38-2269(b)(7). It proved that Mother failed to adjust her circumstances, conduct, or conditions to meet M.M.'s needs as stated under K.S.A. 38-2269(b)(8). It established that Mother did not consistently stay in contact with Saint Francis' staff or consistently attend visitations with

27

M.M. as stated under K.S.A. 38-2269(c)(2). Because Mother had not completed or fully complied with any of her reintegration case plan tasks, the evidence also established that Mother had failed to carry out her reasonable court-approved reintegration case plan as stated under K.S.A. 38-2269(c)(3). Simply put, during the duration of M.M.'s CINC case, Mother took no steps to ensure that M.M. would be safe or that she could care for M.M.'s special needs, if she were ever to get custody of M.M.

Finally, Mother's arguments regarding why the district court erred by finding that termination of her parental rights was in M.M.'s best interests under K.S.A. 38-2269(g)(1) merely repeat her arguments concerning why the district court wrongly found that she was parentally unfit under K.S.A. 38-2269(a). Mother asserts that no evidence supported that M.M.'s physical, mental, and emotional needs would be best served by termination. She contends that Kern "provided no compelling reasons or analysis" why termination of her rights over M.M. would be in M.M.'s best interests. She contends that she acted appropriately with M.M. during her visitations. Also, she contends that all her interactions with M.M. showed how much she loved M.M.

Although Mother may love M.M., the district court must decide whether termination of a parent's rights over a child is in the child's best interests by primarily looking at the parent's actions, not the parent's intentions. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). In making a best interests finding, the district court "must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." 38 Kan. App. 2d at 1105. This means that this court must consider the child's need for permanency as compared to the parent's progress towards reintegrating with the child in "'child time'" rather than "'adult time.'" *In re M.S.*, 56 Kan. App. 2d at 1254.

Here, as of Mother's June 14, 2023 TPR hearing, M.M. was about nine months old and had lived his entire life in DCF custody. Meanwhile, during the nearly nine months

that M.M. had been in DCF custody, Mother continued to use methamphetamine. As just discussed, Mother's ongoing methamphetamine use rendered her currently unable to care for M.M.'s ongoing physical, mental, and emotional needs. The undisputed evidence before the district court proved that Mother continued to use methamphetamine during a new pregnancy. Also, on appeal, Mother never challenges using methamphetamine after she became pregnant while M.M.'s CINC case was pending. So, Mother has never challenged that she continued to engage in the exact same conduct that resulted in M.M. entering DCF custody upon his birth, i.e., using methamphetamine while pregnant. As a result, Mother has abandoned any argument she may have had about using methamphetamine during her new pregnancy. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (an appellant abandons any argument that is inadequately briefed.)

In any case, the district court's finding that termination of Mother's parental rights over M.M. was in M.M.'s best interests was reasonable because the evidence B.P. and S.P. presented at Mother's TPR hearing supported the following: (1) that Mother failed to complete any of her reasonable, court-approved reintegration case plan tasks; (2) that Mother failed to maintain consistent contact with Saint Francis; (3) that Mother failed to consistently attend her weekly one-hour supervised visitations with M.M.; (4) that Mother failed to attend court hearings, including her TPR hearing; and (5) that Mother continued to have a relationship with Father although Father physically abused her. Additionally, as it concerns M.M.'s best interests, Mother's decision to continue her relationship with Father is particularly problematic because the district court had already terminated Father's parental rights over M.M. This means Mother remained in a relationship with a parent who the district court (1) had already found unfit and (2) had already found that M.M.'s best interests were not served by remaining in that parent's custody.

29

To conclude, Kern's testimony as well as Mother's failure to appear at her TPR hearing proved that Mother was unfit by reason of conduct and conditions that rendered her unable to properly care for M.M. and that her conduct and conditions were unlikely to change in the foreseeable future as provided under K.S.A. 38-2269(a). Contrary to Mother's argument otherwise, clear and convincing evidence supported the district court's findings that she was parentally unfit as provided under subsections (b)(3), (b)(4), (b)(7), (b)(8), (c)(2), and (c)(3) of K.S.A. 38-2269. Also, the evidence supporting Mother's parental unfitness established that the district court acted within its discretion when it found that termination of Mother's rights over M.M. was in M.M.'s best interests as provided under K.S.A. 38-2269(g)(1). As a result, we affirm the termination of Mother's parental rights over M.M.

Affirmed.